**ENTE NAZIONALE IDROCARBURI, Plaintiff,**

v.

**PRUDENTIAL SECURITIES GROUP, INC., Defendant.**

No. 90 CIV 4422 (KC).

United States District Court, S.D. New York.

Aug. 1, 1990.

As Modified Aug. 14, 1990.

Shearman & Sterling, New York City by Kenneth A. Caruso, Joseph T. McLaughlin, Jeremy G. Epstein, Michael E. Norton, Jane L. Myers, Stefan W. Engelhardt, for plaintiff.

Cahill Gordon & Reindel, New York City by Thomas F. Curnin, William M. Murphy, Michael J. Lane, Robert Rubinson, for defendant.

CONBOY, District Judge:

This is an action brought pursuant to the Court's diversity jurisdiction by an Italian corporation, Ente Nazionale Indrocarburi ("ENI"), which is the energy and petrochemicals agency of the Italian Government, against Prudential Securities Group, Inc. ("Prudential"), a Delaware corporation with its principal place of business in New York whose principal business is investment banking and securities trading. There are two motions currently pending before the Court, which were submitted on an expedited basis in view of an anticipated motion for a preliminary injunction. The first is ENI's motion for expedited discovery. The second is Prudential's motion to dismiss based on the dual grounds of failure to join an indispensable party whose joinder would destroy the diversity jurisdiction on which this action is predicated, and forum non conveniens.

## BACKGROUND

In this action, ENI claims that Prudential has tortiously interfered with ENI's contract with another Italian corporation, Montedison, SpA ("Montedison"), a large industrial group with business in chemicals, energy and pharmaceuticals. The contract between Montedison and ENI provided for the creation of a joint venture between the two companies, a "marriage" between the public sector and the private sector, in order to achieve the scale necessary to compete effectively internationally. Complaint ¶ 7.[1]

On December 15, 1988, ENI and Montedison entered into an agreement (the "Agreement" or the "Joint Venture Agreement") creating a joint venture company called Enimont and setting forth the terms of the formation, structure, operating rules, and goals of Enimont. *Id.* ¶ 6. Enimont is one of the world's ten largest integrated producers of petrochemicals, bulk and specialty chemicals, and a broad range of chemical intermediates and end products. *Id.* ¶ 7. Enimont's deed of incorporation, established under the laws of the nation of Italy, is dated May 9, 1989. *Id.*

The "marriage" was designed to create equal control of Enimont by the two partners. *Id.* ¶¶ 8, 12. Under the agreement, which we observe is governed by Italian law, ENI and Montedison each hold 40% of the shares of Enimont. The remaining 20% was to be, and has been, sold to the public. *Id.* ¶ 8. Each are to have the same number of directors on the board (five), *id.* ¶ 11, and the board was to appoint a Chairman and a Managing Director, one from ENI and one from Montedison, who are to have equal powers. Exhibit A of the Affidavit of Berardino Libonati, sworn to July 23, 1990 ("Libonati 7/23 Aff.") at Article 12.[2]

---

1. For the purposes of the instant motions, we will assume all of the facts in the complaint to be true.

2. Because this motion is not one for failure to state a claim pursuant to Rule 12(b)(6), we may properly examine matters outside the pleadings, such as the Agreement. *See* Fed.R.Civ.P. 12.

ENI refers to these provisions as establishing the "parity of control" and states that this parity or equality is "the bedrock" supporting the Agreement. Complaint ¶ 12. The portion of the Agreement which is most relevant to the instant action is found in Article 10.3, which provides: "[T]he parties [ENI and Montedison] undertake not to acquire from third parties, in any form whatsoever, either directly or indirectly or through trustees, any shares of Enimont, nor to receive same on a pledge or contango [swap] basis." Libonati Aff., Ex. A at Article 10.3.[3] The Agreement further provides that the parties "shall in any event retain an equal and balanced number of shares as between them." *Id.* at Article 9.1, *see also* Article 9.2. The parity was to last for at least three years. *Id.* at Article 10.3.

The marriage between the parties soured quite quickly. ENI contends that soon after the formation of Enimont, the president of Montedison, Raul Gardini, "embarked upon a course designed to gain control of Enimont." Complaint ¶ 13. Gardini purportedly enlisted the aid of Prudential and two other individuals, Italian Financier Gianni Varasi and French Entrepreneur Jean Marc Vernes. These three "allies" purchased 10.1% of Enimont's stock, with Prudential buying 5.8% and the two others, the remaining 4.3%.

ENI has commenced this action against Prudential only for tortious interference with the Joint Venture Agreement. Specifically, ENI alleges that Prudential's actions, in concert with Montedison, Varasi and Vernes, have caused Montedison to breach Article 10.3 of the Agreement by giving Montedison "indirect" ownership of more than 40% of Enimont's shares.

Extremely relevant to this lawsuit are two actions currently pending in Italy relating to the issue of control of Enimont, one in Italian state court in Milan and the other before an arbitration panel, also in Milan. In the state court action, as the complaint concedes in paragraph 19, ENI has sued

Enimont. In the affidavit submitted here by ENI's Italian counsel in opposition to the motion to dismiss, it is stated that there were three actions brought in the Italian state court: two emergency actions, which actions have been concluded, and one lawsuit that is still pending. Affidavit of Berardino Libonati, dated July 27, 1990 ("Libonati 7/27 Aff."), at ¶¶ 6–10.

On February 23, 1990, ENI brought on its first emergency proceeding, pursuant to Article 700 of the Italian Civil Code of Procedure. ENI, apparently *ex parte*, asked the court to block a shareholders' meeting called for February 27, 1990, the purpose of which was to expand the Board of Directors to give the non-joint venture partners (i.e., the public shareholders) the two seats referred to in the Joint Venture Agreement. ENI also requested a declaration from the court that such an increase in the Board had to be made at an extraordinary, rather than an ordinary, shareholders' meeting. Affidavit of Thomas F. Curnin, sworn to July 23, 1990 ("Curnin Aff."), Exhibit B. The following day, the Italian court denied ENI's application in its entirety. Curnin Aff., Exhibit C. It reasoned that the regular shareholders' meeting should be held and that any damage that might be caused to ENI would ensue not from the holding of the meeting itself, but rather from the decisions approved at the meeting. Because ENI had a remedy under Article 2378 of the Civil Code, in that it "stipulates the possibility of obtaining the suspension of resolutions made in violation of the law and the deed of incorporation through an order by the President of the Court," the court rejected ENI's application under Article 700, concluding that it was "inadmissible and completely unjustified." Curnin Aff., Exhibit C.

The vote at the February shareholders' meeting on the issue of increasing the number of members of the Board was postponed for reasons not made known to us. Libonati 7/27 Aff., Exhibit A at 1. On March 28, 1990, the shareholders, at an

---

**3.** This article of the Agreement was quoted incorrectly in the Complaint at ¶ 9. Accordingly, we prefer to quote the Agreement itself.

ordinary shareholders' meeting, passed a resolution increasing the number of members of the Board of Directors from ten to twelve. Curnin Affidavit, Exhibit D at 2.[4] At that meeting, two new directors, Messrs. Varasi and Vernes, were also elected over ENI's objection. On April 5, 1990,[5] ENI followed the court's advice and petitioned under Article 2378 of the Civil Code for suspension of the resolution passed at the meeting and asked that it be annulled or declared invalid. Curnin Aff., Exhibit D at 2. On May 4, 1990, the Court rejected ENI's petition for a "Decree of Urgency." Curnin Aff., Exhibit E. On such a petition, the court stated that it must consider and rule on

> the soundness of the plaintiff's request before evaluating the severity of the consequences that may derive, both to the contesting partner and the company itself, from the initial execution and the successive annulment of the resolution, since the protection of the law can be accorded only to those who hold a substantial right deserving of protection, and no serious prejudice can be held to exist if said prejudice does not correspond to an injury in the legal sense. The pronouncement of any precautionary ruling is, in fact, conditional on the existence of the so-called *"fumus beni iurie."*

Curnin Aff., Exhibit E at 1. The court held that it did not need to determine, for the purposes of the "precautionary" decision, whether or not the public shareholders (the 20%) had a right to have the Board of Directors expanded or whether the contested resolution was legitimate, but that it only had to determine the probable soundness of the claim. *Id.* at 2.[6] After examining ENI's claims and the facts and law surrounding them, the court concluded that "[a]ll these circumstances tend to render

improbable the soundness of [ENI's] interpretation" and therefore, that "all of the legal requisites for granting the request for suspension under Art. 2378 Civil Code have not been met." *Id.* at 8.

It appears that three days prior to the filing of the second application for emergency relief, a "regular" lawsuit was filed. Libonati 7/27 Aff. at ¶ 19. That lawsuit is the only action which is still pending in the Italian state courts. *Id.* We are told by plaintiff that that lawsuit does not raise any issues that are "relevant" to the issues raised in the instant action. *Id.* We are also informed by plaintiff that Montedison has in Italy "intervened in support of Enimont's position but any judgment in the [Italian] case will run against Enimont alone, and will decide only whether the March 28 shareholder resolution is valid or is a nullity. The judgment will not consider or grant relief for any behavior of Montedison in breach of the Joint Venture Agreement." *Id.*

Despite the fact that ENI argues that no issues of relevance to our proceeding are raised in the Italian state action, our reading of the complaint therein, attached as Exhibit A to the Libonati 7/27 Affidavit, indicates otherwise. Indeed, a subheading of the pleading is denominated "The Agreement between ENI and Montedison of December 15, 1989" (which we take to be mistaken as to the year and to mean the Joint Venture Agreement). Libonati 7/27 Aff., Ex. A at 16. This section, which extends for three full pages, starts with the proposition that although ENI believes that the lawsuit should be decided only with resort to the Articles of Incorporation and Italian statutes, nonetheless, "ENI regards [the Joint Venture Agreement] to be important in that ENI has asserted and presently asserts that on a number of occa-

---

**4.** All page references are to the English translations of the Italian documents.

**5.** The English translation of the Milanese court's opinion of May 4, 1990, attached to the Curnin Aff. at Exhibit D, indicates that the emergency petition was filed on April 5, 1990, but ENI claims in its papers that it was filed on April 4, 1990, Libonati 7/27 Aff. at ¶ 14. We believe counsel for ENI confused the dates, *see also id.*

at ¶ 15 (stating that date of opinion was May 5, 1990, when the opinion itself indicates that it was May 4, 1990), and accordingly, we will follow the dates set forth in the opinion.

**6.** It appears that this standard of "probable soundness" is similar to that used here with regard to applications for preliminary injunctive relief: likelihood of success on the merits.

sions ENI has complied with that agreement in the face of breaches by Montedison." *Id.*

Then, with specific reference to certain articles of the Agreement, ENI sets forth its claim that only "third party investors" who purchased their interests prior to the listing of the stock on the Italian stock exchange, are entitled to have the Board increased. We assume that ENI was indirectly referring to Prudential, Vernes and Varasi, all of whom apparently purchased their shares in the open market. In fact, just two pages later in the pleading, Vernes and Varasi are mentioned by name as being a threat to the equilibrium contracted for between ENI and Montedison, and the reason why the court should permanently enjoin the "illegal" expansion of the Board and the election of the new members. Thus, it is clear that in the Italian state court action, ENI seeks a declaration of the meaning of the Joint Venture Agreement and an adjudication of the rights of the "allies" to elect board members and to vote in general. It is also plain that the court was presented with argument of Montedison's breach of the Joint Venture Agreement. Accordingly, we believe the statement that the "judgment will not consider or grant relief for any behavior of Montedison in breach of the Joint Venture Agreement" is, at the very least, misleading. Furthermore, we cannot fathom ENI's assertion that Montedison, or, for that matter, the "allies," will not be bound by the decision rendered by the Italian court.

From the translations of the news accounts in the Italian press attached to the Curnin Affidavit, we are able to ascertain that the first hearing on the merits of ENI's claim was scheduled for "next Monday" (either May 7 or May 14). Curnin

Aff., Exhibit F, Translation of the May 5, 1990 edition of the Milanese journal *Il sole 24 Ore.* At the oral argument held on Friday July 27, 1990, we asked counsel for ENI the status of this action, but he, astonishing to say, did not know it, and reiterated his position that it did not matter if there had been a hearing on the merits because it involved different issues than those presented in this case. Transcript of the Oral Argument, held July 27, 1990 ("Tr."), at 58–59. ENI has stated in its papers that it does not expect a decision in the proceeding "until the end of the year at the earliest." Libonati 7/27 Aff. at ¶ 19.

The second action that is currently pending in Italy is an arbitration proceeding, pursuant to the Joint Venture Agreement, commenced on March 14, 1990 by Montedison against ENI. We are told in the complaint herein only of the counterclaim asserted by ENI in the arbitration, and not the fact that the arbitration was commenced by Montedison or of the details of Montedison's claims therein.[7] The complaint merely states that the purpose of the arbitration is "to establish whether Montedison has breached the ENI–Montedison Agreement in certain respects" and that ENI seeks damages in that proceeding only against Montedison, and that "ENI does not and cannot seek equitable relief in that proceeding under Italian law." Complaint ¶ 19.

Prior to the submission of its motion to dismiss, counsel for Prudential was unable to procure the legal papers submitted in the arbitration due to counsel for ENI's lack of cooperation, despite our stated interest in seeing all of the papers from the Italian proceedings.[8] He stated, however, that it was his understanding that

---

7. Some of the Montedison's claims in the arbitration include the invalidity of the Joint Venture Agreement and material breaches of that agreement by ENI. Tr. at 6.

8. At the oral argument, we addressed at length the failure of plaintiff's counsel to cooperate with defense counsel in refusing to provide the documents from the Italian actions without receiving some discovery in return. Tr. at 22–27. We firmly stated at the pre-trial conference held the week before (July 19) that we required all

the papers from the Italian actions and that we wished to know the status of those actions as they are essential to our consideration of a motion to dismiss on the grounds of forum non conveniens. We viewed this obligation to provide us with the materials as a joint obligation of both sides, and expected that ENI, the party to all of the Italian actions, would provide Prudential with the necessary materials, without an explicit order from us to do so. Indeed, we had stated, in our opening remarks at the first pre-trial conference, our goal of minimizing litiga-

in those proceedings Montedison has challenged the validity of some or all of the provisions of the Joint Venture Agreement and that ENI has asserted various crossclaims—including an allegation that Montedison breached Article 10.3 of the Joint Venture Agreement through an arrangement with Prudential Securities relating to Prudential's acquisition and voting of Enimont shares.

Curnin Aff. at ¶ 20. Counsel posited that "if this understanding is correct, then the identical issue raised in this complaint is currently, and by prior written agreement [the Joint Venture Agreement], being resolved between the real parties in interest in an Italian arbitration proceeding." *Id.*

When ENI submitted, in its response to the motion to dismiss and pursuant to a telephonic direction by us, all of the papers that counsel for Prudential could not obtain, it became instantly clear that defense counsel's understanding was correct. In fact, ENI's submission to the arbitration panel mentions Prudential by name, *see* Libonati 7/27 Aff., Exhibit C at 21, and asserts a breach of the parity provisions of the Agreement by Montedison because of a "pact" between Montedison and its "friends." *See, e.g., id.* at 22. Indeed, when confronted by a recitation of certain pages of its submission to the panel, ENI's counsel conceded that the issues in this case have been squarely raised in the arbitration. Tr. at 35.

It is ENI's position, however, that Prudential cannot be added to the arbitration "because it is not a party to the Joint Venture Agreement." Libonati 7/27 Aff. at ¶ 25. Consequently, we raised the issue of whether the terms of reference to the arbitral panel could be amended by consent of ENI and Montedison such that Prudential could be added to the proceeding. Counsel for ENI did not know, but in any event, was not satisfied with that option,

because ENI and Montedison have purportedly provided for the type of arbitration which does not allow the arbitration panel to grant equitable relief. We then asked counsel for Prudential if his client would consent to being sued in Italy in an entirely new proceeding on the same grounds which form the basis of the action here. Counsel stated, unequivocally, that Prudential would consent to being joined either in the arbitration, or the state court proceeding, or any new proceeding brought by ENI that embraced the issues raised in this proceeding. Tr. 8–9, 56.

## ANALYSIS

The introductory paragraph of Prudential's argument on the indispensability branch of its motion reads as follows:

> The sole alleged basis for this Court's exercise of jurisdiction over the subject matter of this action is the purported diversity of citizenship of the parties under 28 U.S.C. § 1332(a)(2) (1988) (Complaint ¶ 4). The Complaint reveals, however, that plaintiff ENI is an Italian Corporation (Complaint ¶ 2) and that another Italian corporation, Montedison (Complaint ¶ 5) has sufficient interests adverse to plaintiff regarding the matters raised in this action to render it an indispensable party under Fed.R.Civ.P. 19(b). Joinder of Montedison as a party defendant would eliminate diversity of the parties and thereby eliminate this Court's subject matter jurisdiction. Because Montedison is an indispensable party to this lawsuit, which cannot be joined without eliminating the basis for subject matter jurisdiction, this action should be dismissed pursuant to Fed.R.Civ.P. 12(b)(1) and (7).

Defendant's Memorandum of Law in Support of Motion to Dismiss ("Dft. Mem.") at 10–11.

---

tion costs. Instead, counsel for ENI refused to provide the materials as there had been no "directive" to do so. Tr. at 26. This unfortunate interpretation of our prior discussion put defendant's counsel in the difficult position of having to assemble, over a weekend, what materials it could from Italy and have them translated *de novo*, resulting in unnecessary expense to

his client and stress to him and his colleagues. It further caused defense counsel to have to speculate as to what the missing pleadings said, thereby putting him at a distinct disadvantage in preparing the motion and for oral argument thereon. As a result of this behavior by plaintiff's counsel, defendant also seeks costs.

Rule 19 mandates that we ask two questions: section (a) of the rule asks whether a party is "necessary" to the action, that is, whether the party should be joined if feasible; if the party cannot be joined, then, and only then, does section (b) come into play. The inquiry required under section (b) of the rule is a determination of whether under the circumstances of the particular case, the court could, in equity and good conscience, proceed in the party's absence. If it cannot proceed, the party is labelled "indispensable" and the action should be dismissed.

■ Before we undertake the analysis required by Rule 19, we observe that Prudential's analysis of the issue, as quoted above, clearly indicates that it believes that such a dismissal is based on jurisdictional grounds. According to one commentator, however, the concept of indispensability does not concern the Court's subject matter jurisdiction as much as it deals with the ability or right of the Court to make an equitable adjudication. The major question is whether the court can render a decision which will not impair the rights of the absent party. J. Moore, J. Lucas, and G. Grother, Moore's Federal Practice ¶ 19.05[2] n. 6 at 19–77 ("We would prefer not to put the concept of indispensability on jurisdictional grounds. If the indispensable party is joined and his joinder destroys diversity, then so long as the case is in that posture the court lacks federal jurisdiction. If, however, he is dropped or not made a party, the court has technical federal jurisdiction;" but the court can make the determination that without the absent party, it cannot properly or equitably proceed.)

Thus, we expressly decline to treat Prudential's motion as one to dismiss for jurisdictional defects. We will adopt the commentator's approach, viewing the motion as raising questions which are directed to the court's equitable discretion. This approach is also more compatible with the second branch of Prudential's motion, the forum non conveniens aspect, which requires us to consider many similar factors and which is also addressed to the court's discretion.

As the Supreme Court has stated, the analysis of whether a particular party is necessary and indispensable under Rule 19 "can only be determined in the context of the particular litigation." *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 118, 88 S.Ct. 733, 742, 19 L.Ed.2d 936 (1968); *see Felix Cinematografica v. Penthouse Int'l Ltd.*, 99 F.R.D. 167, 169 (S.D.N.Y.1983) ("the Supreme Court made it clear [in *Provident* ] that . . . indispensability is to be determined on a pragmatic, case-by-case" basis). Despite ENI's argument to the contrary, it is quite apparent that Montedison fits squarely within the definition of a necessary party under Rule 19(a). Montedison "claims an interest relating to the subject of the action and is so situated that the disposition of the action in [its] absence may . . . as a practical matter impair or impede [its] ability to protect that interest." Fed.R.Civ.P. 19(a)(2)(i). Furthermore, its absence may "leave [Prudential] subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations. . . ." Fed.R.Civ.P. 19(a)(2)(ii).

■ Addressing first the harm to Prudential if this court were to decide the merits of the action in Montedison's absence, it is clear that if we were to conclude that Prudential was acting pursuant to some sort of scheme or conspiracy with Montedison in violation of the Joint Venture Agreement, and thus should be enjoined from voting its shares, either the Italian court and/or the Italian arbitration panel (before both of whom the issue of Montedison's breach of the Agreement due to its "collusion" with "allies" is pending) could find otherwise, *i.e.*, that there has been no breach of the Agreement such that the "allies" of Montedison may vote their shares any way they like. Were this to happen, Prudential would plainly be subjected to inconsistent obligations and would be put in the quandary of which court order, the American or the Italian, it should follow.

As for the harm to Montedison, although Montedison has not been heard here, we are confident that if it had been heard it

would state that it does not want this Court to adjudicate whether it breached the Joint Venture Agreement, as it is *waiting for both an Italian court and an arbitration panel to render decisions on this issue* and that any decision by us on the merits of the issue could practically impair its position in those Italian litigations. For example, if we were to conclude that an injunction against Prudential was appropriate, our decision would no doubt have a tremendous impact on the corporate governance of Enimont as more than one quarter of the shares held by the public could not be voted. Furthermore, although we cannot, and need not, conclude now if any decision by us could have a preclusive effect on the pending Italian actions, or even if ENI would seek to use it against any other party in the Italian proceedings, we are not unmindful of the possible transnational consequences of a ruling by a United States court in this matter. *See also infra* at 460–461.

Moreover, the cases cited by ENI as not requiring joinder of Montedison are inapposite. For example, *Roth v. H.A.T. Painters, Inc.*, 126 F.R.D. 40 (E.D.Pa.1989) involved a parent-subsidiary relationship in which it was claimed that the parent breached the subsidiary's contract with the plaintiff therein. The court's holding that the subsidiary was not a necessary party was clearly influenced by allegations in the complaint that the subsidiary was "nothing more than the alter ego of" the parent corporation, *id.* at 42, and that the parent was liable in any event for the subsidiary's breach of the contract. Here, of course, no such circumstances obtain.

The other case cited by ENI, *Arkansas v. Texas*, 346 U.S. 368, 74 S.Ct. 109, 98 L.Ed. 80 (1953), is also distinguishable. There, a Texas charitable foundation had contracted to contribute money to the University of Arkansas. *Id.* at 369, 74 S.Ct. at 110. The State of Texas sued in Texas state court to stop the foundation from making the grant. *Id.* The State of Arkansas, on behalf of its university, sued the State of Texas for interference with contract. *Id.* The Supreme Court, which had original jurisdiction over the action, held

that the foundation did not have to be joined in the lawsuit between the two states. *Id.* In the narrow circumstances of the case, decided almost forty years ago, the Court held that in an action to enjoin interference with a contract, the party prevented from performing the contract was not an indispensable party. *Id.* at 369–70, 74 S.Ct. at 110. We note, however, that despite this holding, the Court declined to proceed with the case while the Texas litigation was pending, which it believed would answer the underlying question of whether the foundation could, under Texas law, donate money out of state. *Id.* at 371, 74 S.Ct. at 111. Eventually, the states settled their dispute, and the Court dismissed the case as moot. 351 U.S. 977, 76 S.Ct. 1042, 100 L.Ed. 1493 (1956).

We have read *Arkansas v. Texas* several times and have exhaustively searched for cases analyzing it or even citing it for the proposition cited by the plaintiff. We are able to find only one case that makes any reference, however tangential, to the indispensability issue. In *Littell v. Nakai*, 344 F.2d 486, 490 (9th Cir.1965), the court concluded that the plaintiff's citation to *Arkansas v. Texas* was inapplicable because it concluded that the suit, although technically a diversity action, should be referred to a Navajo Tribal Court. Furthermore, only one commentator has expounded, albeit briefly, on *Arkansas v. Texas*. 7 C. Wright & A. Miller, Federal Practice and Procedure § 1613 at 197 (1986). The commentator limits the holding of the case as follows: "[i]n an action to enjoin tortious interference with a contract, the party prevented from performing the agreement need not be joined *since his interests are not directly at stake and effective relief can be awarded without him*." *Id.* (emphasis added).

Bearing in mind the Supreme Court's more recent admonition in *Provident, supra*, that indispensability is to be determined on a pragmatic, case by case basis, we believe that the facts of the case before us are very different from those in *Arkansas v. Texas*. Here, Montedison is not merely a passive entity without affirmative

legal rights as the foundation was in *Arkansas v. Texas*. Rather, Montedison has both clear rights and affirmative obligations under the contract which we must construe and which it may be entitled to have performed or declared a nullity in Italy. Thus, it has real interests that are clearly at stake in this action. Furthermore, because there are other Italian actions which are proceeding apace, a real risk of inconsistent rulings could give Montedison only a Pyrrhic victory in the Italian fora. *See supra* at 456–457. Of course, Prudential could also be subjected to multiple and conflicting court orders. Hence, Montedison could win in Italy, but the victory would indeed be hollow if its "ally" was under American court order not to vote its shares with Montedison. Therefore, because here both the defendant and the absent third party have connected interests that are directly at stake, we believe that *Arkansas v. Texas* is inapposite.

 Accordingly, because Prudential may be subjected to inconsistent adjudications, and because Montedison's interests may be practically impaired, Montedison is clearly a party which should be joined if feasible under Rule 19(a). However, because the joinder of Montedison would destroy the jurisdictional predicate for this lawsuit for the reasons stated by Prudential in the portion of its memorandum of law quoted above at page 12, the next question we must ask is whether, in equity and good conscience, we can proceed without Montedison. Rule 19(b) sets out several factors for us to consider:

 to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; [2] the extent to which, by protective provisions in the judgment, by the shaping of relief or other measures, the prejudice can be lessened or avoided; [3] whether a judgment rendered in the person's absence will be adequate; and [4] whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Mr. Justice Harlan restated these factors as follows in *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 109–111, 88 S.Ct. 733, 737–39, 19 L.Ed.2d 936 (1968): (a) the plaintiff's interest in having a forum and "whether a satisfactory forum exists;" (b) the named defendant's interest in avoiding "multiple litigation, or inconsistent relief, or sole responsibility for a liability that he shares with another;" (3) "the interest of the outsider whom it would have been desirable to join;" and (4) "the interest of the courts and the public in complete, consistent, and efficient settlement of controversies." *See also H & H International Corp. v. J. Pellechia Trucking, Inc.*, 119 F.R.D. 352, 354 (S.D.N.Y.1988). The evaluation of these factors is committed to our discretion. *Felix Cinematografica v. Penthouse Int'l Ltd.*, 99 F.R.D. 167, 169 (S.D.N.Y.1983).

### Plaintiff's Interest

Plaintiff's interest in having New York as a forum is manifest: ENI, an agency of the Italian Government, has been unsuccessful in its two attempts to persuade the Italian court to intervene, on an emergency basis, in its conflict with Montedison over control of Enimont. It is clear that ENI hoped it would fare better here in asking us for essentially the same relief than it did back home. The issue of whether Montedison breached the contract has been presented to both an Italian judge and an arbitral panel. Thus, ENI's request in its complaint that Prudential be enjoined from voting its shares because it helped procure such a breach requires us to adjudicate the same issues that are already pending in Italy. *See infra* at 459–460. Furthermore, it is quite apparent that ENI has filed suit in federal court here to exploit our liberal discovery procedures. We do not find these interests to be weighty; indeed, we are distressed by ENI's blatant attempt at forum shopping, just as we would be affronted by a litigant from this country seeking the same or similar relief in this court that it had previously attempted, unsuccessfully, to obtain in two other jurisdictions.

Moreover, there can be no suggestion that ENI, an Italian state agency, lacks a forum at home; in fact, as we have already

observed, it seems clear that the precise issue of whether Montedison has breached the parity provisions of the Agreement due to a "pact" with Prudential and other "friends" is pending in two separate Italian forums: in the state court and in an arbitration. Indeed, even if we were to conclude that the issue is not now pending in either Italian forum, a wholly untenable position, Prudential has consented to be sued in an entirely new cause of action in Italy on the same grounds presented by the instant action, and ENI itself agrees that Italian law provides a similar cause of action for tortious interference. Libonati 7/27 Aff. at ¶ 30. Accordingly, it is clear that there is an alternative, and indeed, infinitely more appropriate, forum.[9] *See also infra* at 460, 461–462. Thus, for all of the foregoing reasons, we find that this first factor for our consideration weighs in favor of Prudential and strongly against ENI.

*Interests of the Defendant and Outside Third–Parties*

With regard to the second *Provident* factor, we have already considered, in our discussion of whether Montedison is a necessary party under Rule 19(a), the possibility of inconsistent adjudications as against Prudential. *See supra* at 456–457. In that discussion, we also addressed the third *Provident* factor, the prejudice to Montedi-

son if we allow the case to proceed. A point which we did not raise in that analysis, but which flows directly therefrom, is that we cannot assume that Prudential will adequately protect Montedison's interests, or for that matter, those of the other "allies," Messrs. Varasi and Vernes. *See H & H International Corp. v. J. Pellechia Trucking, Inc.*, 119 F.R.D. 352, 354 (S.D.N. Y.1988). For instance, in the Italian arbitration, it has been Montedison's position that the Joint Venture Agreement is invalid. Libonati 7/27 Aff. at Exhibit C at 19. It is unclear what position Prudential will take here; *i.e.*, whether it will argue that since there was no valid agreement between Montedison and ENI, it could not have interfered, or whether it will concede the validity of the Agreement, and take the position merely that it did not interfere.

Although ENI argues that it is suing Prudential in tort here, and that the contract action against Montedison is entirely separate from this action, we believe that such an argument elevates form over substance. Assuming for the purposes of this motion that New York law governs the tortious interference claim as ENI asserts, to prove such a claim, ENI must establish each of the following four elements: (1) the existence of a valid contract between the plaintiff and Montedison, (2) Prudential's knowledge of such a contract, (3) Pruden-

9. Since the availability of equitable relief in Italy relates to the consideration of whether there is a suitable alternative forum, we make the following observations. Although counsel for ENI suggested at the pre-trial conference held in this matter in open court last week that equitable relief is not, under Italian law, an available form of relief, we conclude that he must have meant that ENI is unable to obtain such relief in the arbitration proceeding only, for it has already twice attempted to obtain equitable relief in the state action. Curnin Aff. at ¶¶ 10–12 and the exhibits appurtenant thereto. Thus, it is clear that equitable remedies are available in actions commenced in the Italian courts. Furthermore, as the affidavit of Francesco Gianni, Prudential's Italian counsel and "expert" on Italian law, indicates, equitable relief can indeed be sought in the state court against the arbitration proceeding. Affidavit of Francesco Gianni, sworn to July 19, 1990, at ¶ 6 (concluding that a party to an arbitration proceeding in Italy is "not precluded from instituting an action in state court and seeking an

order providing ... protective relief during the pendency of the arbitration proceeding.") Gianni stated: "[w]hile it is true that a panel of arbitrators in Italy is not empowered to issue orders granting equitable relief, it would be incorrect to conclude that litigants in Italian courts are precluded by law or practice from seeking or obtaining equitable relief." *Id.* at ¶ 5. Finally, Prudential's Italian counsel is of the belief that "ENI has not been and is not currently precluded as a matter of Italian procedural law from seeking equitable relief in the Italian courts in order to protect its alleged rights concerning the controversies between and among ENI, Enimont, and Montedison relating to the governances (sic) of Enimont and to the ENI–Montedison [Joint Venture] Agreement." *Id.* at 7. Plaintiff's Italian counsel and "expert" on Italian law does not deny that such relief is available generally, but Libonati does dispute, without any citation to either the relevant provisions of the civil code or the Agreement itself, ENI's ability to seek injunctive relief. Libonati 7/27 Aff. at ¶ 25.

tial's intentional procurement of a breach of the contract by Montedison, and (4) damages caused by the breach. *E.g., Universal City Studios v. Nintendo Co.* 797 F.2d 70, 75 (2d Cir.1986); *Martin Ice Cream Co. v. Chipwich, Inc.,* 554 F.Supp. 933, 945 (S.D.N.Y.1983). Additionally, plaintiff must show that, but for the unlawful actions of Prudential, the contract would have been performed. *Chenoweth & Faulkner, Inc. v. Metro Mobile CTS, Inc.,* 87 Civ. 6294(MJL), 1988 WL 52777 (S.D. N.Y. May 18, 1988) (citing *GLM Corp. v. Klein,* 665 F.Supp. 283, 287 (S.D.N.Y. 1987)). Thus, it is clear that we would be required to look to Italian law, the law that ENI and Montedison chose as the governing law in the Joint Venture Agreement, to determine whether there was in fact a breach of the Agreement. Equally obvious is the fact that we would have to examine Montedison's and ENI's conduct under the contract, an evaluation which would clearly be duplicative of Italian efforts. Accordingly, it cannot be denied that it would be necessary for us to construe several of the critical provisions of the Agreement which have already been extensively presented to both an Italian court and arbitration panel for adjudication, each of whom is, no doubt, in a better position to correctly implement and apply Italian law.[10]

Indeed, it is clear that the type of tort alleged is so entangled with and, in fact, derived from the contractual relationship that we would be compelled to adjudicate the breach of contract claim while deciding the tort claim. *Cf., H & H International Corp.,* 119 F.R.D. at 354 (Judge Sweet found that tort claim was "so entangled with" contract claim such that just relief could not be granted in the absence of the necessary party); *Felix Cinematografica v. Penthouse Int'l Ltd.,* 99 F.R.D. 167, 174 (S.D.N.Y.1983) (Judge Weinfeld found that copyright claim derived from a contractual relationship and its alleged breach, and he

therefore declined to allow the action to proceed without the absent party).

Thus, ENI is, in essence, requesting that we adjudicate whether Montedison breached the contract without allowing Montedison the opportunity to be heard. Plaintiff's Memorandum in Opposition to the Motion to Dismiss at 22 ("ENI's grievance has to do with the Montedison's actions and the tortious conduct by those assisting Montedison—such as Prudential—in taking control of Enimont."). Furthermore, Montedison's inability to be heard on whether its own conduct constitutes a breach of the Agreement certainly rises to the level of "practical impairment" under the rule. Although, as we stated above, we do not know what preclusive effect, if any, an Italian court would give an order or a judgment entered by us, because there is even a slight risk of preclusion, we see no reason to needlessly complicate and compound the previously pending Italian actions by issuing an order on the merits here. *Felix Cinematografica,* 99 F.R.D. at 173. Moreover, we do not believe that it is possible for us to shape any relief we might grant to the plaintiff in a way that would accommodate, and not prejudice, the interests of the defendant and the absent parties. Accordingly, this third *Provident* factor weighs heavily against ENI.

### Interests of the Court and the Public

The fourth *Provident* consideration is related to the third: it concerns the interest of the court and the public in complete, consistent, and efficient settlement of controversies. We conclude that this factor also weighs convincingly against ENI. We have already observed that there is a possibility of inconsistent adjudications. We further observe that this action, brought when there were already two actions pending in Italy, appears to be, to quote Judge Weinfeld,

---

10. We do not understand counsel for ENI's continued assertion at the oral argument that a determination of whether the contract had been breached is a question of fact and that there is no need for us to construe Italian law. Tr. 44–47. It is quite clear that the determination of whether there has been a breach would re-

quire us to construe the language of the Agreement as a matter of Italian law and that only after making such a determination as to what the Agreement means could we possibly apply the facts to the Agreement. Of course, in any such undertaking, the *rules* of construction can be, and often are, decisive.

a *sheer waste* not only of the litigants' time and effort and the imposition of additional and unnecessary legal fees and expenses ... but, surely equally as important, a squandering of judicial time and effort. It simply defies common sense to countenance such a situation. It would be unfair to the defendant[ ] and contrary to public policy and public interest.

*Felix Cinematografica*, 99 F.R.D. at 173 (emphasis added). There is simply no good reason for this Court to duplicate what is being accomplished in the Italian fora. It is unmistakably in the public's interest that our courts not be ensnared in what is an entirely Italian dispute between an Italian state agency and a large Italian corporation over an Italian Joint Venture agreement that is governed by Italian law. Our trial and appellate courts are congested enough without our having to set aside other pressing matters to adjudicate, on an emergency basis, the merits of a wholly foreign dispute under foreign law. This argument on judicial economy is further underscored by the fact that there are two actions simultaneously pending in Italy, in at least one of which plaintiff concedes similar issues are pending. Moreover, even if we were to adjudicate ENI's claim against Prudential here, it would necessarily entail a presentation of Italian law, *see supra* at 459–460, as well as Italian witnesses and documentary evidence, and translations into English thereof, which may lack the nuance and subtlety of the Italian language, all of which would no doubt have the effect of protracting the proceeding needlessly. Accordingly, this last consideration weighs heavily against ENI and in favor of Prudential.

Therefore, for all of the foregoing reasons, we conclude that we cannot, in equity and good conscience, proceed with the action in the absence of Montedison. It would be best for all concerned, if the question at issue, namely whether Montedison breached the Agreement because of an illicit pact with Prudential and others, is to be adjudicated in a forum where all of the interested parties could be joined and have

their claims heard. Thus, we hold that the action should be dismissed on this ground.

■ The other branch of the motion to dismiss, predicated upon the doctrine of forum non conveniens, presents an even stronger basis for dismissal. Because many of the factors under the analysis mandated by *Gulf Oil Co. v. Gilbert*, 330 U.S. 501, 508–09, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947), overlap with those already discussed above, we will not restate each and every item discussed above. Rather, we will attempt to augment our analysis where appropriate with considerations not yet reviewed. We note that like the indispensability analysis, a forum non conveniens analysis is committed to our discretion. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256, 102 S.Ct. 252, 266, 70 L.Ed.2d 419 (1981). The "ultimate inquiry" in a forum non conveniens evaluation is where the place of "trial will best serve the convenience of the parties and the ends of justice." *Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 527, 67 S.Ct. 828, 833, 91 L.Ed. 1067 (1947).

The so-called "public interest" factors include the following: the "administrative difficulties flowing from court congestion;" the " 'local interest in having localized controversies decided at home;' " the "interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action," [and] the "avoidance of unnecessary problems ... in the application of foreign law," *Piper Aircraft Co.*, 454 U.S. at 241 n. 6, 102 S.Ct. at 258 n. 6, (citing and quoting *Gulf Oil*, 330 U.S. at 509, 67 S.Ct. at 843). It is plain that each factor leads to the conclusion that our forum is inconvenient.

At the outset, we must look at the presumption to be accorded plaintiff's choice of forum. Because plaintiff is foreign, its choice of forum is entitled to less deference than if the plaintiff resided in the forum. *Piper Aircraft Co.*, 454 U.S. at 255–56, 102 S.Ct. at 265–66. Furthermore, as we indicated above, the plaintiff has perfectly adequate, if not more appropriate, alternative fora in its home country where all interested parties to the lawsuit, to wit, ENI, Eni-

mont, Montedison, Prudential, Varasi and Vernes, can be joined. However, since the defendant resides in the district, which factor usually weighs against dismissal, *see Manu Int'l S.A. v. Avon Products, Inc.,* 641 F.2d 62, 67 (2d Cir.1981), we conclude that the plaintiff's choice of forum is a neutral consideration.

We have already alluded to the administrative problems in trying the action here; adding this litigation to our already crowded docket in lieu of its being handled by a court at its origin is senseless. *See supra* at 460–461; *see also Ernst v. Ernst,* 722 F.Supp. 61, 65 n. 4 (S.D.N.Y.1989) (observing that this court " 'sits in one of the busiest districts in the country' "). Moreover, it is certain, given the fact that the plaintiff is an entity of the Italian Government, that the "local interest in having localized controversies decided at home," *Gulf Oil,* 330 U.S. at 509, 67 S.Ct. at 843, is strong. Despite ENI's assertion that the tort arose here and the fact that Prudential resides here, it is clear that Italy's interest in the litigation is far stronger than that of the United States. We bear in mind that the tort cause of action, which the plaintiff concedes is substantially the same cause of action in both the United States and Italy, Libonati 7/27 Aff. at ¶ 30, is derived from the contract claim, and because the contract must be construed in accordance with Italian law, the interest of Italy in this litigation is greater than our own interest. *See supra* at 459–460, *see also Ernst v. Ernst,* 722 F.Supp. at 62 n. 1, 65 (this court held that France had a stronger interest than the United States in that litigation, and implicitly determined that the contract issues were the true focus of the litigation, although the plaintiff had also alleged claims of fraud and conversion). Italy's superior interest may also be perceived from the great number of news articles concerning the conflict over control of Enimont which have appeared in the Italian press, and the fact that important Italian politicians, such as Socialist Minister Bettino Craxi, have commented on the confrontation. Curran Aff., Ex. F (Articles from the journals *Il sole 24 Ore* of Milan and the *Corriere Della Sera* also of Milan, dated May 5, 1990).

We have already made known our desire to leave issues of Italian law for the Italian courts who are most competent to handle them. *See supra* at 461; *see Ernst v. Ernst,* 722 F.Supp. at 65–66 (citing especially *Broadcasting Rights Int'l Corp. v. Societe du Tour de France, S.A.R.L.,* 675 F.Supp. 1439, 1448 (S.D.N.Y.1987), *mot. to vacate denied,* 708 F.Supp. 83 (S.D.N.Y.1989)). Thus, all of the public factors weigh in favor of dismissal.

As for the so-called "private interest" factors, such as the location of evidence and witnesses, the "availability to compel attendance of unwilling witnesses," as well as "all other practical problems that make trial of a case easy, expeditious and inexpensive," *Piper Aircraft Co.,* 454 U.S. at 241 n. 6, 102 S.Ct. at 258 n. 6 (citing *Gulf Oil,* 330 U.S. at 508, 67 S.Ct. at 843), these, too, favor dismissing the case for the reasons already elaborated upon above, *see supra* at 460–461. As Judge Sweet found in *Broadcasting Rights Int'l Corp. v. Societe du Tour de France, S.A.R.L.,* 675 F.Supp. at 1448, the focus of a tortious interference claim is almost always on the contractual aspects of the claim. It is clear that most, if not, all of the witnesses and documents relating to the contractual aspect of this dispute are located in Italy, as the contract was negotiated and executed by two Italian corporations in Italy. This testimony and document production would require extensive and expensive translation into English. Finally, the most significant practical impediment to our trying the case here is that it is impossible for all of the parties who have some interest in the litigation to be joined in this action. *See supra* at 456–461. Thus, the litigation over the control of Enimont would be waged, needlessly and, indeed, wastefully, in several different fora on two sides of the Atlantic ocean.

Therefore, for all of the foregoing reasons, we hold that this forum is an inconvenient one. Accordingly, the defendant's motion is granted on this ground as well as the indispensability ground, and, the action

is hereby dismissed. The defendant's motion for costs is denied. We lament the attitude of plaintiff's counsel, expressed at the oral argument, *see* footnote 8 *supra,* that the absence of an explicit court order excused and permitted the conduct toward his adversary resorted to here. However, we do not believe that under these circumstances a sanction of costs is authorized. Because we conclude that the action must be dismissed, we deny as moot the plaintiff's motion for expedited discovery.[11]

SO ORDERED.

---

**11.** Plaintiff's citation to *Investment Properties Int'l, Ltd. v. IOS, Ltd.,* 459 F.2d 705 (2d Cir.1972) is unavailing. That case dealt with the district court's denial of the opportunity to take discovery on a jurisdictional motion. As we indicated above, neither our indispensability analysis nor the forum non conveniens analysis relates to the court's jurisdiction over the action; rather, both are addressed to the court's discretion.